## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| QUAKER FABRIC CORPORATION, et al.,[1] | Case No. 07-11146 (KG) |
| Debtors. | & 07-11147 (KG) |
| | Joint Administration Requested |
| | **Hearing Date: TBD** |
| | **Objection Deadline: September 4, 2007 at 4:00 p.m. (ET)** |

## DEBTORS' APPLICATION FOR ORDER PURSUANT TO SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE, AND BANKRUPTCY RULE 2014 APPROVING RETENTION OF RAS MANAGEMENT ADVISORS, INC. AS LIQUIDATION CONSULTANT

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") hereby apply to this Court (the "Application") for entry of an order pursuant to sections 327 and 328 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* 1330 (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") authorizing the employment and retention of RAS Management Advisors, Inc. ("RAS") as Liquidation Consultant for the Debtors under a general retainer for services rendered and to be rendered during the pendency of these chapter 11 cases. In support of the Application, the Debtors rely upon and incorporate by reference the Affidavit of Richard A. Sebastiao In Support Of Debtors' Application For Order Pursuant To Sections 327 And 328 Of The Bankruptcy Code,

---

[1] The Debtors, the last four digits of their taxpayer identification numbers and their respective addresses are: Quaker Fabric Corporation (XX-XXX3106), 941 Grinnell Street, Fall River, MA 02721, and Quaker Fabric Corporation of Fall River (XX-XXX2940), 941 Grinnell Street, Fall River, MA 02721.

And Bankruptcy Rule 2014 Approving Retention Of RAS Management Advisors, Inc. As Liquidation Consultant (the "Sebastiao Affidavit"), a copy of which is attached hereto as Exhibit A. In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.    On August 16, 2007 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" orders, including an order to have these cases jointly administered.

2.    The Debtors have continued in possession of their respective properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 327 and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

## BACKGROUND OF THE DEBTORS

5.    Quaker Fabric Corporation, a Delaware corporation, through its wholly-owned operating subsidiary, Quaker Fabric Corporation of Fall River, a Massachusetts corporation (collectively, the "Company" or "Debtors"), began operations in 1945 and became a leading designer, manufacturer and worldwide marketer of woven upholstery fabrics for residential

2

furniture, one of the largest producers of Jacquard upholstery fabrics in the world, and a leading

developer and manufacturer of specialty yarns, particularly chenille yarns.[2]

6.     Over the past few years, the markets for the Debtors' products have become

increasingly competitive with both domestic fabric mills and fabric mills located outside the U.S.

manufacturing products for sale into the U.S. market.  The U.S. textile industry, in general, has

been hit hard by foreign imports, particularly from China.  Recently, cost and other factors have

afforded imported fabrics a significant competitive advantage in the domestic market.  Imported

furniture coverings, including leather, fabric in both roll and "kit" form and faux suede products

were estimated to represent approximately 42% of sales into the U.S. fabric market during 2004,

up from 29% in 2003 and 11% in 2002, and by some estimates, such imports may now comprise

approximately 75% of total U.S. fabric sales.

7.     Because of the capital intensive nature of the upholstery fabric manufacturing

process, the Debtors' fixed costs are relatively high, causing any shortfall in sales to quickly

erode margins and bottom line profitability.  In the face of growing domestic and foreign

competition, the Debtors' financial performance has deteriorated since the second half of 2004.

Net sales for the Debtors were $289.1 million, $224.7 million, and $151.7 million for 2004,

2005, and 2006, respectively, a fall-off of approximately 47.5% over the three-year period.  Net

sales continued to decline in the first quarter of 2007.  Net sales were approximately $32.6

million for the first quarter of 2007, representing approximately a 14% reduction on an

---

[2]    The Debtors conduct foreign operations through Quaker Fabric Mexico, S.A. de C.V. ("Quaker
       Mexico"), Quaker Textil do Brasil, Ltda. ("Quaker Brazil"), and Quaker Textile Corporation
       ("Quaker Textile").  Quaker Mexico, Quaker Brazil, and Quaker Textile are wholly-owned
       subsidiaries of Quaker Fabric Corporation of Fall River.  Quaker Brazil, Quaker Mexico and Quaker
       Textile have not filed bankruptcy petitions.  The Debtors' business is operated on a consolidated
       basis, but to the best of their knowledge, all intercompany transactions are clearly and properly
       recorded on the Debtors' books and records.

3

annualized basis from net sales for 2006. The problems created by this revenue shortfall have been exacerbated by a number of other factors, including higher energy and raw material prices.

8.      In response to these challenges, over the past three years the Debtors have taken aggressive restructuring actions to reduce operating costs. These actions included staffing reductions and the idling of certain manufacturing equipment, as well as the consolidation and sale of certain manufacturing and warehousing space in Fall River Massachusetts. The Debtors reduced the workforce from 2,314 employees as of January 1, 2005 to 1,008 employees as of December 30, 2006. During 2006, the Debtors sold two manufacturing plants and about $4.0 million of machinery and equipment, reduced selling, general and administrative costs by approximately $10.0 million and manufacturing costs by approximately $20.0 million on an annualized basis. In 2006, the Debtors also offered for sale three (3) owned manufacturing facilities, its corporate headquarters and research and development facility, and sixty-six acres of undeveloped land.

9.      Ultimately, the steady decline in sales outpaced the speed at which the Debtors have been able to reduce costs. As a result, the decline in sales has had a direct impact on their ability to service debt obligations and maintain adequate liquidity.

10.      On July 3, 2007, the Debtors' senior lenders provided the Debtors with notices of default (discussed below), declaring that any future advances to the Debtors would only occur on a discretionary basis. Based on an extensive review of their various options and liquidity issues, the Debtors determined that, if an immediate resolution of their liquidity issues could not be found, they would need to commence an orderly liquidation of their business or a sale of their assets. As a result of their liquidity issues, the Debtors ceased substantially all of their operations

4

and terminated all but approximately 40 of their approximately 930 employees as of July 2, 2007.

11.    On July 9, 2007, the Debtors retained RAS Management Advisors, Inc. ("RAS") to (i) manage, in consultation with management, the liquidation of their assets outside the normal course of business in a manner designed to yield the greatest return to the Debtors' creditors and (ii) advise the Debtors with respect to budgeting matters related to the liquidation process. Since being retained, RAS has aggressively marketed the Debtors' inventory to more than 200 customers and known purchasers of such products and the Debtors' machinery and equipment to more than 75 potential buyers. RAS and the Debtors have also identified multiple potential buyers for their intellectual property and all of the real estate parcels owned by the Debtors. The Debtors have marketed various parcels of real estate to varying degrees since 2006, including the listing of several parcels with an experienced commercial broker.

12.    RAS and the Debtors have been actively marketing all of the Debtors' assets, with the exception of the Debtors' foreign subsidiaries, since July 9, 2007. More than 25 potential buyers have visited the Debtors' Fall River facilities since July 9, 2007 and more than 49 offers have been made for various assets, including equipment, inventory and real estate. The Debtors have received five (5) bids or expressions of interest for some substantial combination of the Debtors' hard assets and/or intellectual property, seven (7) bids (including bulk bids) for all of the Debtors' machinery and equipment, nine (9) bids (including bulk bids) for all of the Debtors' inventory, 16 bids for certain portions of the Debtors' inventory, 16 bids (including bulk bids) for the Debtors' intellectual property, and 15 bids (including bulk bids) for the individual parcels of the Debtors' real estate.

13.    The Debtors intend to execute their plan of pursuing the sale of substantially all of their assets and/or other strategic transactions as promptly as practicable, in accordance with provisions of the Bankruptcy Code, in a manner that will afford all of the Debtors' economic stakeholders an opportunity to participate in the process and otherwise to maximize the value of the Debtors' assets for all creditors.

## Prepetition Indebtedness

14.    On November 9, 2006, the Debtors entered into a $25 million amended and restated senior secured revolving credit agreement with Bank of America, N.A. (the "Bank") and two other lenders (as amended, the "2006 Revolving Credit Agreement"). The Debtors' obligations to the revolving credit lenders are secured by all of the Debtors' assets, with a junior interest in the Debtors' real estate and machinery and equipment.  Simultaneously, the Debtors entered into two (2) senior secured term loans in the aggregate amount of $24.6 million with GB Merchant Partners, LLC ("GB"), as Agent for the term loan lenders (as amended, the "2006 Term Loan Agreement"). The two term loans consist of a $12.5 million real estate loan and a $12.1 million equipment loan, (together, the "Term Loans").  The Term Loans are secured by all of the Debtors' assets, with a senior priority security interest in the Debtors' machinery and equipment and real estate and a junior interest in the remaining assets.

15.    Both the 2006 Revolving Credit Agreement and the 2006 Term Loan Agreement have maturity dates of May 17, 2010, and are together referred to herein as the "2006 Loan Agreements." The lenders under the 2006 Loan Agreements are referred to herein collectively as the "Prepetition Lenders." Advances to the Debtors under the 2006 Revolving Credit Facility bear interest at the prime rate plus 1.25% or LIBOR (London Interbank Offered Rate) plus

6

2.75%. The Term Loans bear interest at the LIBOR rate plus 7.75%, subject to the default rates described below.

16.    In connection with the respective security interests under the 2006 Loan Agreements, the parties entered into an intercreditor agreement which, among other things, establishes the relative rights, priorities, and duties of the respective parties thereto with respect to the liens and security interests of the Prepetition Lenders under the 2006 Loan Agreements.

17.    On July 3, 2007, both the Bank and GB provided the Debtors with "Notice of Defaults and Exercise of Remedies; Reservation of Rights" letters (the "Default Notices"), alleging that events of default had arisen under the 2006 Loan Agreements. The effect of these Default Notices includes an increase in the interest rates on the 2006 Loan Agreements to the Default Rate, as defined in the 2006 Loan Agreements, which is 2% higher than the otherwise applicable interest rates in the Agreements. In addition, the Default Notice stated that the respective Prepetition Lenders have no further obligation or commitment to make additional loans to the Debtors and that the decision to make any further Loans will be made in the sole discretion of the respective Prepetition Lenders.

18.    On July 18, 2007, the Debtors, with the consent of the Bank, entered into a letter agreement with GB (the "July 18 Letter Agreement") providing for a $2.0 million overadvance to the Company under one or both of the Term Loans under the 2006 Term Loan Agreement (the "GB Overadvance"). The July 18 Letter Agreement further provides for the payment of interest at the Default Rate under the 2006 Term Loan Agreement and a Forbearance and Funding Fee equal to 20% of any amounts funded under the GB Overadvance, with the proceeds of each such GB Overadvance to be used solely to fund wind-down expenses and other costs and expenses set

7

forth in a wind-down budget prepared under the direction of and approved by RAS and further approved by the Bank and GB.

19.    As of the Petition Date, there were approximately $32.7 million of loans outstanding under the 2006 Loan Agreements, including approximately $22.4 million of loans outstanding under the 2006 Term Loan and approximately $10.3 million of loans outstanding under the 2006 Revolving Credit Agreement.

## RELIEF REQUESTED

20.    By this Application, the Debtors request that the Court enter an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code authorizing the Debtors to employ and retain RAS as Liquidation Consultant for the Debtors under a general retainer for services rendered and to be rendered during the pendency of these chapter 11 cases pursuant to the terms of the RAS engagement as set forth in the letter agreement, dated August 13, 2007, and attached hereto as Exhibit B (the "Engagement Letter").

## BASIS FOR RELIEF REQUESTED

1.    Bankruptcy Code section 327(a) provides, in relevant part, as follows:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professionals persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title

11 U.S. C. § 327(a).

2.    Bankruptcy Code section 328(a) provides, in relevant part, as follows:

> The trustee . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different

8

from the compensation provide under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

> 3.      Bankruptcy Rule 2014 provides, in relevant part, as follows:

> An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee.

Fed. R. Bankr. P. 2014.

## RETENTION OF RAS MANAGEMENT ADVISORS, INC.

21.      On July 11, 2007, the Board of Directors unanimously approved the engagement of RAS, effective as of July 9, 2007, to provide the Debtors with restructuring advice. The Debtors have chosen RAS to continue such engagement because of its extensive experience with liquidations and chapter 11 cases. RAS has assisted numerous other companies in undergoing processes similar to those contemplated in these chapter 11 cases.

22.      RAS is a crisis management and turnaround firm of independent professional consultants with specialties in areas ranging from finance to manufacturing, distribution, marketing and general management. RAS' consultants are seasoned professionals with an average of 30 years of business management experience.

23.      RAS should be employed under a general retainer because of the variety and complexity of the services that will be required during these proceedings.

24.      In view of RAS' experience in crisis management, the Debtors' retention of RAS is necessary in order to enable the Debtors to execute faithfully their duties as debtors in possession and to deal with many of the needs and problems of the Debtors which may arise in the context of their chapter 11 cases in a most efficient and timely manner. The Debtors believe

9

that RAS is well qualified to serve them in these chapter 11 cases and that the retention of RAS

is in the best interest of the Debtors' estates and creditors.

      25.     The Debtors desire to employ RAS to perform various services to assist the

Debtors in dealing with their financial crisis, as described in greater detail in the Engagement

Letter.

      26.     It is expected that RAS will provide the following services, on the terms set forth

in the Engagement Letter and as modified herein:

      a)     Reviewing and assisting the Debtors in developing the Debtors' debtor-in-possession budget, revenue and cash flow projections and all other financial and accounting information;

      b)     Negotiating the sale prices and related terms and conditions of all sales of the Debtors' assets;

      c)     Negotiating with, and reporting to, the Debtors' significant creditors, including without limitation, trade creditors and banks (including lenders under any debtor-in-possession credit arrangement);

      d)     Assisting the Debtors in complying with the requirements of the Bankruptcy Code;

      e)     Assisting the Debtors in developing and implementing a plan of liquidation; and

      f)     Assisting the Debtors with cash management.

      27.     To the best of the Debtors' knowledge, RAS and all of its associates of RAS are

"disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, and

neither RAS nor any of the associates of RAS hold any interest materially adverse to the

Debtors' estates.

      28.     As reflected in the Sebastiao Affidavit, RAS has represented or may represent

persons or entities that may have been, may now be, or may become creditors or debtors of the

Debtors.  Nevertheless, to the best of the Debtors' knowledge, RAS neither represents nor holds

10

any interest adverse to the Debtors in the matters upon which the Debtors have requested that RAS be employed.

29.    RAS has agreed not to share with any person or firm the compensation to be paid for services rendered in connection with these cases other than the RAS associates assigned to this project.

30.    Subject to this Court's jurisdiction with respect to professional fees, the Debtors have agreed to compensate RAS for its services at its usual hourly and daily rates in effect at the time services are rendered (as outlined in the Affidavit).  The Debtors have also agreed to reimburse RAS in full for its cash disbursements and for such expenses as RAS customarily bills to its clients.  The Debtors have agreed that RAS may apply its retainer in these cases to its fees and expenses as they are accrued, but such compensation and reimbursement of expenses is subject to allowance by the Court upon appropriate application and upon notice and a hearing.

31.    The Debtor has further agreed to pay the RAS weekly invoices as they are presented and approved by the Debtors' Chief Financial Officer.  RAS's role in this case requires that the firm be responsible for the day to day review of all financial activities of the Debtors. Consequently, the Debtors believe RAS should not be subject to the same compensation schedule as other professionals in these cases (*see* Motion Of The Debtors For An Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals) and will not be required to record its time in tenths of an hour.  RAS will, however, submit daily timesheets as it has on other cases in this jurisdiction and be required to provide monthly fee applications for approval by this Court.  RAS will also provide copies of weekly invoices to (i) the United States Trustee, (ii) the Debtors' secured creditors, and (iii) any Creditors' Committee appointed in these cases.

11

32.    The Debtors respectfully submit that the terms of the proposed retention are reasonable and based on the customary compensation charged by RAS and comparably skilled professionals in matters outside and other than chapter 11 cases, as well as cases under chapter 11, and have been approved and implemented in not just this jurisdiction but also in chapter 11 cases elsewhere.  Indeed, the entire engagement as set forth in the Engagement Letter is common within the industry and reflects what is considered to be "market" both in and out of chapter 11 proceedings, in light of RAS's experience in liquidations and the scope of work to be performed pursuant to its engagement.  Accordingly, the Debtors respectfully submit that the terms of the proposed engagement of RAS should be approved.

## NO PRIOR REQUEST

33.    The Debtors have not previously sought the relief requested herein from this or any other Court.

## NOTICE

34.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (iii) counsel to the Debtors' lenders; and (iv) any party having filed an entry of appearance in these cases.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

DB02:6190827.2

066599.1001

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, (i) under sections 327 and 328 of the Bankruptcy Code approving the employment of RAS as Liquidation Consultant pursuant to the terms of the Engagement Letter to perform the services described herein, and (ii) granting to the Debtors such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
     August __, 2007

QUAKER FABRIC CORPORATION

By: _____
Name: Larry Liebenow
Title: President and CEO

QUAKER FABRIC CORPORATION OF FALL RIVER

By: _____
Name: Larry Liebenow
Title: President and CEO

Debtors and Debtors in Possession

# **Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| Quaker Fabric Corporation of Fall River, et al., | ) | Case Nos. 02-_____ |
| Debtors. | ) | through 02-_____ |
|  | ) | (Jointly Administered) |

**AFFIDAVIT OF RICHARD A. SEBASTIAO IN SUPPORT OF
DEBTORS' APPLICATION FOR AUTHORITY TO EMPLOY
RAS MANAGEMENT ADVISORS, INC. AS LIQUIDATION CONSULTANT
UNDER GENERAL RETAINER**

I, Richard A. Sebastiao, being duly sworn, depose and state:

1. I am a principal in RAS Management Advisors, Inc. ("RAS"), a crisis management and turnaround firm. I make this Affidavit pursuant to sections 327 and 328 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

2. I am generally familiar with the business of RAS and have made inquiry concerning the facts set forth herein prior to making this Affidavit.

3. Hereinafter, I refer to my firm and myself collectively as RAS. In accordance with Bankruptcy Rule 2014(a), RAS discloses its connections with the above-captioned debtors (the "Debtors"), their creditors, all other parties-in-interest, and their respective attorneys and accountants as follows:

(a) RAS began assisting the Debtors on July 9, 2007 with respect to the liquidation of its assets and dealings with its creditors.

1

(b)    RAS has received payment in full for the pre petition services provided to the Debtors either through direct payment or as an offset to the pre petition retainer. Since July 9, 2007, RAS has received $167,370 in payment from the Debtors for services previously rendered. In addition, RAS has received pre petition retainers of $150,000 and $75,564 of said retainer is remaining at the petition date after netting $74,436 for services rendered pre petition thru August 14, 2007. Fees and expenses for August 15-16, 2007, estimated at $15,000, will be offset against such pre petition retainer balance once those amounts are known.

(c)    RAS has been promised that it will be paid for post petition services on a weekly basis at the rates usually charged by RAS for such services with those payments being subject to further application and final approval of the Bankruptcy Court. The daily and hourly rates to be charged by RAS in performing the services set forth in the Debtors' Application for Authority to Employ RAS as its Liquidation Consultant Under General Retainer range as follows:

|  | Daily | Hourly |
|---|---|---|
| Principal | $4,250 | $425 |
| Consultants | $2,400 - $2,900 | $240 – $290 |
| Clerical |  | $30 |

RAS will not record its time in tenths of an hour due to the nature of its assignment; however, each associate will submit a daily timesheet with the weekly invoice detailing the nature of the work performed, just as RAS has done on other cases in this district. Daily rates will be charged for days when a minimum of 10 hours are worked. There is no charge for hours in excess of 10 hours per day.

(d)    In the normal course of business, RAS revises its hourly rates annually. Any such adjustments, which will not exceed 5%, will be disclosed to this Court and the Debtors. The Debtors believe that RAS' daily and hourly billing rates are reasonable. While it is not anticipated that RAS personnel will have to travel to the Debtors' Brazilian or Mexican subsidiaries, if such travel is required, time spent in foreign countries is billed at a 10% premium. All travel will be invoiced at 50% of the applicable rate.

2

(e)    RAS is not a creditor of the Debtors and has no direct or indirect relationship to, connection with, or interest in the Debtors.

(f)    RAS has no connection with the Debtors, creditors, other parties-in-interest, or their attorneys or accountants, except as provided in paragraph 3(g) below and on Schedule 1 attached hereto and, that RAS may serve as a professional person in other matters, wholly unrelated to the Debtors, in which attorneys or accountants of the Debtors, creditors or other parties in interest also serve as professional persons.

(g)    RAS has performed services for certain companies where Bank of America (one of the Debtors' secured lenders) has referred RAS to that company (see Schedule 1). The fees generated by such referrals are immaterial to RAS' overall revenues over the last 5 years. RAS has sold assets of other Debtors to an affiliate of Gordon Brothers (another of the Debtors' secured lenders) on more than one occasion through an auction basis in chapter 11 and also outside of chapter 11 in other cases. In addition, as a receiver for another company and for other Debtors, RAS has contracted with an affiliate of Gordon Brothers to act as the real estate agent for various retail leases and a distressed property. RAS has not taken any fees or commissions from Gordon Brothers in any of those transactions.

(h)    In addition, based upon my review of search results from the firm's records, RAS has provided, and may continue to provide, services for various entities shown on <u>Schedule 1</u> who are involved in the Debtors' cases, which services are not related to the Debtors' bankruptcy proceedings. No services have been provided to these creditors or other parties in interest which could impact their rights in the Debtors' cases, nor does RAS involvement in these cases compromise its ability to continue such consulting services.

(i)    As part of its diverse practice, it is likely that the firm has provided, and will provide in the future, consulting or other advisory services to entities who are or may become involved in these proceedings but who are unknown to me. RAS has not and will not represent the interests of any of these aforementioned entities in connection with these proceedings.

4.    Except as may be stated above, I hereby represent that neither I nor any agent of

my firm holds nor represents any interest adverse to the Debtors' estates.

3

5.     RAS connections with the Debtors, creditors, or other parties in interest, their respective attorneys and accountants are as set forth above.  Except as may be stated above, I hereby represent that, to the best of my knowledge, I am, and each agent of my firm is, a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

6.     I hereby represent that RAS has agreed not to share with any person (except agents of my firm assigned to this case) the compensation to be paid for the services rendered in this case.

7.     RAS has received retainer for services to be rendered as Liquidation Consultant to the Debtors from and after the petition date in the amount of $150,000, which sum, upon information and belief, was paid by the Debtors from the operation of their business or utilization of credit facilities in the ordinary course of business.  As of the Petition Date $75,564 remains of said retainer; however, this amount will be reduced by any charges for work performed on August 14, 2007 once those amounts are known.

8.     I shall amend this statement immediately upon my learning that (i) any of the within representations are incorrect, or (ii) there is any change of circumstance relating thereto.

9.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 16, 2007

_Richard A. Sebastiao_

Sworn Before Me this 16th day of August, 2007 in the County of Newport in the State of Rhode Island, by

_Laura A MacSweeney_
Notary Public
My commission expires on 3/26/11

DL RI 2031644
Exp 12-27-11

4

## SCHEDULE 1

1.      **Bank of America:**   RAS has been referred to clients by Bank of America or its affiliates in one bankruptcy case in 2003-2004 and charged fees of approximately $500,000.  In addition, Bank of America or its affiliates referred RAS to another customer in a non -bankruptcy case in 2004 where our fees were approximately $28,000. The total of these two cases represents less than 6% of RAS fee billings in 2003-2004. Until the current case, there has been no other activity or billings with referrals from either secured lender.  Bank of America was the secured lender on one other non-bankruptcy case in which RAS was involved, but that company directly hired RAS based upon a prior relationship with an RAS agent.  RAS was referred to the Debtors by Bank of America and Gordon Brothers or their affiliates in this case

. 5

# **<u>Exhibit B</u>**



August 13, 2007

Mr. Larry Liebenow
President and CEO
Quaker Fabric Corporation of Fall River
1082 Davol Street
Fall River, MA  02720

Dear Mr. Liebenow:

This letter is to confirm the terms of our proposed engagement by Quaker Fabric Corporation of Fall River and its affiliates which are filing for chapter 11 protection under the U.S. Bankruptcy Code (collectively, the "Company") to perform the tasks outlined below.

## ASSIGNMENT

We are being engaged by the Company to manage, in consultation with management, the liquidation of the assets of the Company in a manner that yields the greatest return to the Company's creditors in chapter 11.  We will concentrate our efforts in 1) the collection of receivables where we will attempt to maximize the use of the Company's remaining staff, 2) the sale of raw material and finished goods inventory by various means including soliciting bulk bids, working with Company staff to sell inventory to customers and vendors for immediate payment and any other means that will maximize the net recovery to the creditors, 3) the sale of the machinery and equipment through a number of methods including seeking bulk bids and item by item transactions to end users, if feasible, 4) the sale of the real estate through the use of whatever means may seem appropriate, 5) evaluation of the Company's other hard and soft assets to determine the value thereof and potential recoveries, and 6) the recovery of any deposits and prepaids to the extent possible.  In addition, in consultation with management, we will seek to minimize the expenses of the liquidation to the extent possible in order to maximize the net recovery.  We will also be responsible for advising the Company with respect to budgeting matters related to the liquidation process including, but not limited to, expenditures by the Company, staffing levels and employee and outside consulting firm compensation matters.  We will report directly to you.  We will also assist the Company in communicating with its unsecured and secured creditors.

In addition to the above, we will assist the Company in its reporting and tax compliance programs in conjunction with its counsel and tax advisors.

The Company agrees to provide an Officer and Director of the Company for the duration of this assignment.

The assignment will be ongoing with no set expiration date.  However, this assignment can be immediately canceled by either party upon written notice and approval by the bankruptcy court.

**CONFIDENTIALITY**

You have instructed RAS Management Advisors, Inc. and our firm agrees, that this engagement and all information obtained by it or its representatives concerning the business and operations of the Company is confidential and will be held in the strictest of confidence. Notwithstanding the foregoing, the parties hereto agree that any advice, analysis and other work product of RAS Management Advisors, Inc., may be shared with the Company's secured lenders and unsecured creditors after discussion with the Company, and the Company shall be provided with adequate notice of any proposed meetings involving RAS Management Advisors, Inc. and such lenders and creditors and be afforded the opportunity to participate in such meetings.

It is our company policy to destroy all documents related to this assignment one year following our final invoice.

**INDEMNIFICATION**

The Company agrees to indemnify and hold harmless, RAS Management Advisors, Inc., its employees, directors, officers, and agents, jointly and severally, from any and all claims whatsoever that may be made against any or all of them, arising from the performance of their duties described in this letter and as modified from time to time in the future. Claims, as used in this agreement, shall include, without limitation, all reasonable attorney's fees and reasonable legal expenses incurred by RAS Management Advisors, Inc., unless any such claim is determined by a court of competent jurisdiction, to have resulted from the willful misconduct or gross negligence of RAS Management Advisors, Inc., its employees, officers, directors or agents.

**FEES**

We require a $100,000 retainer wired in accordance with the attached instructions prior to filing for chapter 11. We will require payment by wire transfer as each additional weekly invoice is presented and will offset our final invoice against the retainer. We will bill for our services, plus out of pocket expenses, on a weekly basis. Any excess retainer will be returned to you within 10 days of completing the engagement and at the conclusion of the assignment we require payment of any excess billings above the retainer within 10 days of invoicing. The Company is free to terminate our services at any time, at which point we would offset all unpaid invoices and unbilled time and expenses against the retainer and return any unused portion to the Company. Due to the breadth of our assignment, we will not invoice our time in tenths of an hour, but we will provide daily worksheets for each person employed on this assignment in support of our invoices. All of our invoices will be subject to court approval and the appropriate fee applications.

Our rates thru December 31, 2007, are as follows, and increases at that date, if any, will be at or under 5%:

|  | Daily | Hourly |
|---|---|---|
| Richard Sebastiao | $4,250 | $425 |
| Phil Stetson | $2,900 | $290 |
| Michael J. Rizzo | $2,400 | $240 |
| Clerical | | $30 |

Any work required to be performed out of the country, and none is anticipated, will be billed at a 10% premium to the above rates.

Daily rates are charged for days where work is performed away from our offices for up to 12 hours per day. Hours in excess of 12 hours per day and hours spent working at our own offices are charged at the hourly rates. Travel is billed at one-half the standard rate. Out of pocket expenses will be billed in addition to the above fees and will include coach class airfares (none are expected), hotel, meals, mileage, parking, car rentals, photocopying and other incidentals as well as any attorney fees incurred (none are expected) related to this assignment. We reserve the right to substitute similarly experienced personnel at our discretion, but will use our best efforts to keep the team identified above in place for the duration of this assignment.

Please indicate your agreement with the contents of this letter by signing and returning the enclosed copy of this letter.

We look forward to working with you on this assignment.

Very truly yours,
RAS Management Advisors, Inc.

Richard A. Sebastiao
President

Agreed:
Quaker Fabric Corporation of Fall River
By:_____
Name: Larry A. Liebenow Date_____
Title: President and CEO_____

3

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

QUAKER FABRIC CORPORATION, et al.,[1]

Debtors.

Chapter 11

Case No. 07-11146 (KG)
       & 07-11147 (KG)

Joint Administration Requested

**Re: Docket No. _____**

### ORDER PURSUANT TO
### SECTIONS 327 AND 328 OF THE BANKRUPTCY CODE,
### AND BANKRUPTCY RULE 2014 APPROVING RETENTION OF RAS
### MANAGEMENT ADVISORS, INC. AS LIQUIDATION CONSULTANT

Upon the Motion[2] of the above-captioned Debtors for entry of an order pursuant

to sections 327 and 328 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules") authorizing the

employment and retention of RAS Management Advisors, Inc. ("RAS") as Liquidation

Consultant for the Debtors under a general retainer for services rendered and to be rendered

during the pendency of these chapter 11 cases; and this Court finding, further, that RAS does not

hold or represent any interest adverse to the Debtors or their estates in the matters on which it is

to be retained, that RAS is a "disinterested" person as that term is defined in section 101(14) of

the Bankruptcy Code, that the terms and conditions of RAS's employment as set forth in the

---

[1]    The Debtors, the last four digits of their taxpayer identification numbers and their respective addresses are: Quaker Fabric Corporation (XX-XXX3106), 941 Grinnell Street, Fall River, MA 02721, and Quaker Fabric Corporation of Fall River (XX-XXX2940), 941 Grinnell Street, Fall River, MA 02721.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Application and the Engagement Letter are reasonable; and due and proper notice of this Motion having been given; and it appearing that no other or further notice is required; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested is in the best interest of the Debtors, their estates, and creditors and after due deliberation, and sufficient cause appearing therefor, it is hereby

ORDERED, that the Application is granted; and it is further

ORDERED, that pursuant to section 327 and 328 of the Bankruptcy Code, the Debtors are authorized to employ RAS, under a general retainer, as their Liquidation Consultant in these cases to perform all of the services set forth in the Engagement Letter, pursuant to the terms and conditions set forth therein, and to pay fees and reimburse expenses to RAS on the terms and at the times specified in the Engagement Letter, the Application and this Order; and it is further

ORDERED, that RAS shall be compensated in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules as may then be applicable, from time to time, and such procedures as may be fixed by order of this Court; and it is further

ORDERED, that notwithstanding the foregoing, fee applications filed by RAS shall be subject to review only pursuant to the standards set forth in section 328 of the Bankruptcy Code and not subject to the standard of review set forth in section 330 of the Bankruptcy Code; and it is further

2

ORDERED that, anything to the contrary herein or in any other Order of the Court notwithstanding, RAS shall not be required to record its time in tenths of an hour, but will be required to supply daily timesheets for each individual and shall be paid weekly as described in the Engagement Letter, however, such fees and expenses will be finally determined by the Court upon appropriate application therefor and upon notice and a hearing in accordance with sections 330 and 331 of the Bankruptcy Code and the applicable Bankruptcy Rules.  This shall not affect RAS' right to apply its retainer to fees and expenses as they accrue, subject to allowance of such fees and expenses by the Court; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: August___, 2007

_____
KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

3